**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**EASTERN DIVISION**

UNITED STATES OF AMERICA,

           Plaintiff,

vs.


DARREN JAMES ACKERMAN,

        Defendant.

Case No. 21-cr-2023-CJW


**REPORT AND RECOMMENDATION**
**ON DEFENDANT'S MOTION TO**
**SUPPRESS**

_____

**TABLE OF CONTENTS**

                    **Page**

I.      *INTRODUCTION*.................................................................3

II.    *FINDINGS OF FACT*.......................................................6

      A.    *The 911 Call* ...........................................................6

      B.    *The Entry* ................................................................7

      C.    *The Arrest*...............................................................8

      D.    *The Protective Sweep* ............................................9

      E.    *J.J.'s Cellphone* ...................................................10

      F.    *The WPD Search Warrant* ....................................10

      G.    *The Black Hawk County Search Warrant* ....................10

      H.    *The Interviews*......................................................11

III.   *DISCUSSION*................................................................12

1

**A.**     *The Parties' Arguments* ..................................................................12

**B.**     *The Protective Sweep* ..................................................................13

        *1.*     *Whether the Protective Sweep was Conducted in the Space Adjoining the Arrest* ..................................................................14

        *2.*     *Whether There Were "Articulable Facts" to Justify a Protective Sweep* ..................................................................17

**C.**     *Whether J.J. Consented to the Search* ..................................................................18

**D.**     *Whether Evidence Seized Pursuant to the First Warrant is "Fruit of the Poisonous Tree"* ..................................................................19

        *1.*     *Whether the First Warrant Contains Probable Cause After Allegedly Tainted Statements are Excised* ..................................................................19

        *2.*     *Good Faith Exception* ..................................................................22

**E.**     *The Second Search Warrant*..................................................................24

        *1.*     *Compliance with Standing Order*..................................................................24

        *2.*     *Fruit of the Poisonous Tree* ..................................................................25

        *3.*     *The Parties' Arguments* ..................................................................25

        *4.*     *The Source of Information in the Second Affidavit* ..................................................................25

        *5.*     *Whether the Affidavit Contains Probable Cause if the Statements are Excised* ..................................................................27

        *6.*     *Whether Captain Herbst's Observations Constitute an Unconstitutional Search* ..................................................................28

        *7.*     *Good Faith Exception* ..................................................................32

**F.**     *Interviews* ..................................................................33

*IV.*    *CONCLUSION* ................................................................................38

## I.    INTRODUCTION

On April 14, 2021, the Grand Jury charged Defendant Darren James Ackerman with one count of Possession of Firearms by a Prohibited Person in violation of 18 U.S.C. Sections 922(g)(1) and 924(a)(2) and one count of Possession of Stolen Firearms in violation 18 U.S.C. Sections 922(j) and 924(a)(2).  (Doc. 2.)

The matter before the Court is Defendant's Motion to Suppress.  (Doc. 23.)  The Government timely filed a response.  (Doc. 27.)  Both parties filed post-hearing briefs. (Docs. 33, 34.)  The Honorable Charles J. Williams, United States District Court Judge, referred the motion to me for a Report and Recommendation.  I held a hearing on Tuesday, May 10, 2022.  (Doc. 32.)

This motion arises from an October 25, 2020 incident in which City of Waterloo police officers and Black Hawk County Sherriff's deputies entered Defendant's home and arrested him.  After the arrest, officers made a protective sweep where they encountered firearms and drug paraphernalia.  A search warrant based on that sweep was issued.  The issues presented are (1) whether the protective sweep was proper and (2) whether additional evidence found after a search warrant issued is "fruit of the poisonous tree."

At the hearing, the following Government exhibits were admitted without objection:

1.  Audio recordings of 911 calls;

2.  Google maps of the neighborhood in question;

3.  Arrest Warrants;

4.  Waterloo Police Department ("WPD") call for service;

5.  Videos:

3

  a. Officer Rhonda Weber's body worn camera ("BWC") video;

  b. Officer Ben Bloker's patrol car dashboard camera video; and

  c. Officer Adam Galbraith's patrol car dashboard camera video.

6. BWC Videos:

  a. Officer Adam Galbraith's BWC video;

  b. Officer Brian Weldon's BWC video; and

  c. Officer Ben Bloker's BWC video.

7. Screenshot Defendant at bottom of stairs from Officer Weber's BWC;

8. Videos:

  a. Officer Brian Weldon's BWC video;

  b. Officer Rhonda Weber's BWC video;

  c. Officer Adam Galbraith's patrol car dashboard camera video; and

  d. Officer Brian Blocker's BWC video.

9. Screenshot of syringe from Officer Blocker's BWC;

10. Screenshot of the discovery of a syringe from Officer Blocker's BWC;

11. Screenshots of items recovered from Defendant's person from Officers Bloker's and Weber's BWC;

12. Photo of stairwell;

13. Photos of "canning area" and toolbox;

14. Photo of a firearm in canning area;

15. Photos of a firearm in canning area;

16. Photo of the inside of canning area;

17. Photo of shelf in canning area;

18. Photo of the area outside of canning area;

19. Photo of basement;

20. Photo of basement area with table;

21. Photo of table in basement area;

22. Photo of table with digital scale;

23. Photo of table with narcotics paraphernalia;

24. Photo of basement floor;

25. Photo of basement floor with shotgun cartridge;

26. Photo of basement floor;

27. WPD search warrant;

28. Black Hawk County Sheriff's Department ("BHCSD") search warrant;

29. Screenshot of stairs from Officer Weber BWC;

30. Screenshot of basement stairwell from Officer Weldon BWC;

31. Screenshot of basement stairwell from Officer Weldon BWC;

32. Photo of Winchester M1 in bag in kitchen;

33. Photo AM-15 under mattress;

34. Photo of all firearms recovered inside residence;

35. Photo of front of XXX Reed Street;

36. Video of October 26, 2020 interview with Defendant; and

37. Video of November 2, 2020 interview with Defendant.

Defendant filed an amended inventory of items to be suppressed. (Doc. 31.) Defendant also attached the following to his motion:

1. A Waterloo Police Department search warrant application and warrant to search of XXX Reed Street dated October 25, 2020 (Def. Ex. A) and

2. A Black Hawk County Sheriff's Department search warrant application and warrant to search of XXX Reed Street dated October 25, 2020 dated October 25, 2020 (Def. Ex. B).

The Government called to testify the following officers with the WPD: Adam Galbraith, Rhonda Weber, Ben Bloker, and Brian Weldon. The Government also called

5

the following deputies from the BHCSD: Mark Herbst, Steve Haas, Andrew Snyder, and Lance Teisinger. I found all the witnesses to be credible. For the following reasons, I respectfully recommend that the District Court **deny** Defendant's Motion to Suppress.

## II.     FINDINGS OF FACT

The following findings were garnered from hearing testimony and the parties' exhibits.

### A.     *The 911 Call*

On October 25, 2020, Beverly Lyons called 911 and reported that her son, Darren Ackerman ("Defendant"), tried to "choke out" his girlfriend J.J. Defendant was keeping J.J.'s phone from her and was possibly holding the couple's infant daughter hostage. (Gov. Ex. 1A.) Ms. Lyons reported to the 911 operator that J.J. ran from the couple's residence on Reed Street to Ms. Lyons's home on Columbia Street. (*Id.*; Gov. Ex. 2.) She also informed the operator that Defendant had outstanding warrants for drug court violations. (Gov. Ex. 1A.)

The operator called Ms. Lyons back and informed her that the WPD was sending Officer Rhonda Weber to meet J.J. and Ms. Lyons at Ms. Lyons's home.[1] (Gov. Ex. 1B.) At this point, Ms. Lyons again warned the operator that when law enforcement arrived at the Reed Street address it may turn into a hostage situation because Defendant was likely high and knew he was facing prison. (Gov. Ex. 1B.) Neither Ms. Lyons nor J.J. knew if there were weapons in the Reed Street home. (Gov. Ex. 1C.) J.J. opined, however, that she did not think Defendant would hurt their daughter. (Gov. Ex. 1A.)

At 9:52 a.m., Officer Weber arrived at Ms. Lyons's home. (Gov. Ex. 4 at 3.) She spoke with Ms. Lyons, J.J., and Earl Lyons about the situation. J.J. told Officer

---

[1] Officer Weber, who was retired by the time of the hearing, began working for the WPD in 1991 and worked on the drug task force, in the crime laboratory, as a hostage negotiator, and as a patrol officer. (Weber Hr'g Test. at 62.)

Weber that Defendant threatened J.J., put his hands around her neck, punched her face, and would not return her phone.  (Gov. Ex. 5 Weber Body Cam. at 10:03-10:05:00.).  J.J. also informed Officer Weber she did not have a key with her to the Reed Street house.  (*Id.*)  J.J. accompanied Officer Weber to the Reed Street residence.  During the car ride, J.J. advised Officer Weber that "You can just push the front door in."  (*Id.* at 10:08:36.)

## B.    *The Entry*

Upon arriving at the Reed Street house, Officer Weber confirmed that J.J. lived at the house and asked her if the officers on the scene could force their way into the home.  (*Id.* at 10:10:07-10:10:18.)  J.J. replied, "Do what you have to do."  (*Id.*)  Officer Weber relayed J.J.'s permission to the other officers.

Before forcing entry, however, WPD Officer Adam Galbraith knocked on the front door and called for Defendant to answer.[2]  At the front door with Officer Galbraith were Deputy Andrew Snyder,[3] Sergeant Andrew Clark, and Officer Weber.  (Galbraith Hr'g Test. at 8.)  At the hearing, Officer Galbraith testified that Defendant knew him from previous interactions involving Defendant and the sale or distribution of narcotics.  (Galbraith Hr'g Test. at 5-6.)  Regardless, Defendant did not answer the door.

Meanwhile, WPD Officers Benjamin Bloker[4] and Brian Weldon[5] had positioned themselves at the back door of the house.  After Defendant failed to respond for

---

[2] Officer Galbraith is a graduate of the Iowa Law Enforcement Academy and began his law enforcement career in 1996.  (Galbraith Hr'g Test. at 2-3.)  He has worked in the patrol division and the drug crime unit.  (*Id.*)

[3] Deputy Snyder worked for the BHCSD as a Sheriff's Deputy from February 2001 until his retirement in November 2021.  (Snyder Hr'g Test. at 52.)

[4] Officer Bloker studied police science at Hawkeye Community College and attended the Law Enforcement Academy.  (Bloker Hr'g Test. at 80-81.)  He began his career in 1996 and he is assigned to patrol.  (*Id.*)

[5] Officer Weldon worked as a police officer for the City of Waterloo for 27 years.  In October 2020, he was working patrol.

approximately nine minutes, Officer Galbraith attempted to kick the front door down.[6] (Gov. Ex. 5 Weber Body Cam. at 10:19-10:22.) He was unsuccessful because the door was dead bolted.[7] (Galbraith Hr'g Test. at 9.) At the same time, Officer Bloker attempted to break down the back door and ultimately succeeded at 10:21. (Gov. Ex. 6 Bloker Body Cam. at 10:21.)

## C. *The Arrest*

Officers entered the house through the back door with firearms or tasers drawn and began searching for Defendant. (Galbraith Hr'g Test. at 11.) As they searched the main level, law enforcement learned that Defendant was threatening to take his own life with a firearm. (Gov. Ex. 5 Galbraith Car at 10:15.) Finding no one on the main level, Officer Weber opened the door to the basement where she saw Defendant at the bottom of the stairs, holding his daughter with one hand, and a cellphone in the other. (Gov. Ex. 5 Weber Body Cam. at 10:21:52.) The officers ordered Defendant to come up the stairs with his daughter. (*Id.* at 10:21:57.) Officer Galbraith testified, and body camera footage shows, that the officers ordered Defendant to come up the stairs to remove him from an unknown location to one where law enforcement had control. (*Id.*) In this case,

---

[6] During this attempt to break the door down, Officer Galbraith's body worn camera was dislodged from his vest and deactivated. Officers Galbraith and Weber both testified that in their experience physical activity—such as running or making an arrest—sometimes dislodged the cameras. (Galbraith Hr'g Test. at 9-10, 38; Weber Hr'g Test. at 73.) Given that reality, it does not strike me as strange or suspicious that Officer Galbraith's efforts to kick in the door dislodged his camera here. Officer Weber's BWC video depicts Officer Galbraith's vigorous exertions at this task. (Gov. Ex. 5 Weber at 10:19:00-10:21:00.) Officer Weber's video also appears to show her handing Officer Galbraith his BWC that she later discovered. (*Id.* at 10:27.) Moreover, other BWC video shows virtually all aspects of the encounter and there is no reason to conclude that Officer Galbraith's BWC video would depict something inconsistent with the testimony or other video.

[7] The Government and Defendant both describe the house as "barricaded." (Docs. 27 at 13; 33 at 3.) The front door Officer Galbraith attempted to kick down was deadbolted. (Galbraith Hr'g Test. at 36-37.) The rear door was nailed shut with a 2"x 4" board. (*Id.* at 37.)

the basement had areas that were as yet unseen and thus were unknown to officers. (Galbraith Hr'g Test. at 12.)

Defendant dropped the cellphone, walked up the stairs, and passed his daughter to Officer Weber. The officers ordered him onto the ground and handcuffed him. While searching his person incident to the arrest, officers found $1,100 dollars in denominations they testified are consistent with drug sales, a syringe that law enforcement suspected contained methamphetamine, and a knife. (Galbraith Hr'g Test. at 13-14, 30.)

**D.      *The Protective Sweep***

After making the arrest, Officer Galbraith and Deputy Snyder conducted a protective sweep of the basement. Officer Galbraith stated that one factor in his decision to conduct the protective sweep was his knowledge that Defendant manufactured methamphetamine fifteen years ago and, if he was making methamphetamine in the basement, it could pose a danger. (Galbraith Hr'g Test. at 15.) Deputy Snyder had also warned law enforcement entering the Reed Street home that Defendant might have a gun. (*Id.* at 16-17.) Officer Galbraith also considered the possibility that the gun was unaccounted for and unsecured in making the protective sweep. Another factor was that some time passed between J.J. leaving the Reed Street home and law enforcement arrival during which unknown individuals may have arrived at Reed Street. (*Id.* at 16.)

After entering the basement, Officer Galbraith saw the butt of a firearm sticking out of the open door to the "canning room."[8] (*Id.* at 20.) Looking in that room, he saw two rifles lying out. (*Id.*; Gov. Exs. 14-18.) Specifically, a Diamond Arms 16-gauge shotgun and a Harrington and Richardson Fieldsman .22-calliber bolt-action rifle. (Galbraith Hr'g Test. at 22.)

---

[8] Officer Galbraith's use of "canning room" to describe this area of the basement seems quaint but accurate. I noted no preserves, jams, or jellies stored there, but it did appear to be the sort of basement space that might be suitable to store canned goods.

9

Officer Galbraith then entered a second open room in the basement, located at the base of staircase, where he observed torches, a digital scale, a spent shotgun shell, and a drug pipe. (*Id.* at 23-25; Gov. Exs. 21; 22; 23)

**E.    *J.J.'s Cellphone***

After Defendant was removed from the house and the protective sweep was completed, J.J. asked law enforcement for help locating her cellphone. (Gov. Ex. 5 Weber Body Cam. at 10:28:15; Galbraith Hr'g Test. at 27-28.) Officer Galbraith returned to the basement with Officer Weldon to search for the phone. (Gov. Ex. 8 Weldon Body Cam. at 10:34:52; Galbraith Hr'g Test. at 27.) Officer Weldon searched the room containing drug paraphernalia and found the phone. (Gov. Ex. 8 Weldon Body Cam. at 10:34:52-10:36:25.)

**F.    *The WPD Search Warrant***

Officer Galbraith drafted the affidavit upon which the "WPD warrant" or "first warrant" was issued. (Gov. Ex. 27.) Officer Galbraith testified that he applied for a search warrant because of the knife, money, and loaded syringe found on Defendant's person. (Galbraith Hr'g Test. at 28-29.) He also applied for a search warrant because of the guns he observed during the protective sweep of the basement. (*Id.* at 29.) He testified that he would have still sought a search warrant to look for evidence of drugs and drug sales based only on the evidence found on Defendant's person in the search incident to the arrest. (*Id.*) While executing the search warrant, law enforcement found additional firearms. (Gov. Exs. 32, 33, 34; Galbraith Hr'g Test. at 33-34.)

**G.    *The Black Hawk County Search Warrant***

While Waterloo police waited for the WPD search warrant, the BHCSD sought its own search warrant to search for stolen property. (Gov. Ex. 28.) Captain Mark Herbst[9]

---

[9] Captain Herbst works for the BHCSD and is a captain in the patrol and investigative divisions. (Herbst Hr'g Test. at 92.)

arrived at Reed Street while Waterloo police were obtaining a search warrant. (Herbst Hr'g Test. at 94.) Law enforcement was present in the house to secure it when Captain Herbst arrived. Captain Herbst testified that other officers told him that there were tools and toolboxes in Defendant's basement that may be related to the investigation of the Defendant Captain Herbst was working on. (*Id.* at 95.) He later clarified that he was told enough "to pique [his] curiosity." (*Id.* at 109.)

After his arrival, Captain Herbst went to the basement accompanied by Officer Weber. (*Id.* at 95.) In the basement, he observed a few toolboxes and registration for a boat. (*Id.* at 95, 109.) Captain Herbst testified that while in the basement he knew that the first search warrant was not ready to be executed and that a protective sweep was already completed. (*Id.* at 110.)

After his inspection of the basement with Officer Weber, Captain Herbst then helped Investigator Haas draft a second search warrant; specifically, he helped draft the addendum to that warrant. (*Id.* at 96.) Investigator Steve Haas[10] was one of the investigators working on a burglary case in which Defendant was a suspect. (Haas Hr'g Test. at 116.) He testified that he wrote the search warrant and used information provided by officers at the Reed Street house to do so. (*Id.* at 120.) The second search warrant was issued and executed at 3:00 p.m. (*Id.* at 121.) Deputies recovered items associated with burglaries but no firearms during the execution of the second warrant. (*Id.* at 114.)

## H.    *The Interviews*

On October 26, 2020, and November 2, 2020, Defendant made statements to investigators while in custody. (Gov. Exs. 36; 37.) BHCSD Lieutenant Lance Teisinger conducted both interviews.[11] (Teisinger Hr'g Test. at 125.)

---

[10] Investigator Haas worked for the BHCSD for 27 years. He finished his career as a detective. (Haas Hr'g Test. at 116.)

[11] Lance Teisinger has been in law enforcement since 1987. (Teisinger Hr'g Test. at 124.) He has worked in the patrol, civil, investigation, and jail divisions. (*Id.*)

At the October 26, 2020 interview, Lieutenant Teisinger read Defendant his *Miranda* rights. (*Id.*) He testified that the purpose of the interview was to discuss Defendant's involvement in thefts and burglaries. (*Id.*) Defendant, however, brought up firearms. (*Id.* at 126.) Lieutenant Teisinger then asked Defendant about firearms but Defendant then declined to talk about that. (*Id.*) Later in the interview Defendant mentioned he planned to use one of the firearms to take his own life. (*Id.*)

After more than a week in custody, the November 2, 2020 interview was conducted because Defendant sent a "kite," a note requesting to speak with Lieutenant Teisinger. (*Id.* at 126-27.) Lieutenant Teisinger again read Defendant his *Miranda* rights. (*Id.* at 127.) At no point during either interview did Defendant request a lawyer. (*Id.* at 129.)

## III. DISCUSSION

### A. The Parties' Arguments

Defendant seeks the suppression of the following items:

1. Crossman Arms Model 160 Pell gun, .22 caliber rifle, serial number 234762; found on October 25, 2020, at [ ] Reed Street, Waterloo, Iowa (found unknown in residence).
2. Diamond Arms / Stevens, single shot 16 gauge shotgun; found on October 25, 2020, at [ ] Reed Street, Waterloo, Iowa (found in basement).
3. Harrington & Richardson, Model 852 Fieldsman, bolt action .22 caliber rimfire rifle; found on October 25, 2020, at [ ] Reed Street, Waterloo, Iowa (found in basement).
4. Winchester M1 Carbine, semi-automatic rifle with magazine; found on October 25, 2020, at [ ] Reed Street, Waterloo, Iowa (found in kitchen).
5. Anderson Arms Manufacturing Multi Cali AM-15 rifle, serial number 20051138; found on October 25, 2020, at [ ] Reed Street, Waterloo, Iowa (found in bedroom).
6. Several assorted rounds of ammunition; found on October 25, 2020, at [ ] Reed Street, Waterloo, Iowa (various places in house).

> 7. Subsequent in-custody statements of the defendant to law enforcement on October 26 and November 2, 2020.

(Doc. 31.)

Defendant argues that the protective sweep was not conducted in the space adjoining the arrest. (Doc. 23-1 at 4.) Defendant also asserts that the Government is unable to articulate facts justifying the protective sweep. (*Id.*). Defendant also argues that the evidence law enforcement seized is "fruit of the poisonous tree." (*Id.* at 5.)

The Government argues that law enforcement made its protective sweep in the area adjacent to where they arrested Defendant. (Doc. 27 at 10.) The Government asserts that law enforcement had articulable facts justifying a protective sweep. (*Id.* at 12-14.) The Government also argues that because J.J. asked law enforcement to search for her phone, the search of the basement would have occurred anyway and revealed the firearms. (*Id.* at 16.) Also, the Government argues that Defendant's interview statements should be admitted because Defendant's request to suppress them is untimely and because the interviews are not fruit of the poisonous tree. (Doc. 34 at 2.)

## B.    *The Protective Sweep*

It is well established that law enforcement is allowed to perform protective sweeps as a safety precaution. This exception to the search warrant requirement, however, is not without limit. "Upon legally entering a residence, officers have the authority to conduct a protective sweep of the residence if the officers reasonably believe, based on specific and articulable facts, that the residence harbors an individual who could be dangerous." *United States v. Pruneda*, 518 F.3d 597, 603 (8th Cir. 2008) (citing *Maryland v. Buie*, 494 U.S. 325, 334 (1990); *United States v. Walsh,* 299 F.3d 729, 733 (8th Cir. 2002)). "Without a warrant, probable cause, or reasonable suspicion, officers may 'look in closets and other spaces, immediately adjoining the place of arrest' to ensure officer safety." *United States v. Aguilar*, 743 F.3d 1144, 1147 (8th Cir. 2014) (citing

13

*Buie*, 494 U.S. at 334). "A protective sweep is limited to a cursory inspection of spaces where a person may be found and may not last longer than is necessary to dispel the reasonable suspicion of danger." *Pruneda*, 518 F.3d at 603. "A protective sweep is proper even if the potential individual being searched for is unidentified." *Hatcher*, 441 F. Supp. 3d at 740-41 (citing *United States v. Waldner*, 425 F.3d 514, 517 (8th Cir. 2005)).

Thus, "[a] 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *United States v. Alatorre*, 863 F.3d 810, 813 (8th Cir. 2017) (quoting *Buie*, 494 U.S. at 327). "The government bears the burden of proving that [the protective sweep] exception to the search warrant requirement applies." *United States v. Green*, 560 F.3d 853, 856 (8th Cir. 2009).

### 1. *Whether the Protective Sweep was Conducted in the Space Adjoining the Arrest*

Defendant argues that the evidence at issue was discovered in areas not immediately adjoining the place of arrest. (Docs. 23-1 at 4; Doc. 33 at 3.) Defendant asserts that the arrest did not happen until he was physically apprehended at the top of the stairs. (Doc. 33 at 2.) The Government responds that Defendant's arrest began in the basement at the foot of the stairs and was completed at the top of the stairs. (Doc. 27 at 4, 12.)

"A Fourth Amendment seizure occurs 'when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen.'" *United States v. Flores-Lagonas*, 993 F.3d 550, 559 (8th Cir. 2021) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n. 16 (1968)). Still, "[a] seizure does not occur unless the individual actually submits to the 'show of authority.'" *Flores-Lagonas*, 993 F.3d at 559-60 (quoting

*California v. Hodari D.*, 499 U.S. 621, 628 (1991)).  In short, a seizure occurs when an individual submits to a show of authority.

Here, law enforcement seized Defendant at the bottom of the stairs.  Law enforcement opened the basement door with weapons drawn and pointed at Defendant. He did not attempt to flee and submitted to their authority.  *See Flores-Lagonas*, 993 F.3d at 560 (explaining that where a person does not submit to a show of authority, including drawn weapons, there is no seizure).  His actions, as shown on Officer Weber's BWC video, demonstrate that he was seized at the bottom of the stairs by a show of authority from the top of the stairs and then physically restrained near the top of the stairs.

Defendant argues that a person is seized by a show of authority only if physical force is absent.  (Doc. 33 at 2 (citing *Hodari D.*, 499 U.S. 621 at 626-27).)  But Defendant's argument ignores the sequence of events.  Defendant first submitted to a show of authority while in the basement where law enforcement encountered him.  He was at the bottom of the stairs holding his daughter and a cellphone.  Rather than go down into an unknown area, officers, with weapons drawn, ordered Defendant to the top of the stairs.  He complied.  That compliance was submission to their authority and thus, a seizure.  *Flores-Lagonas*, 993 F.3d at 560.  At the top of the stairs, law enforcement handcuffed and searched him.  Had law enforcement not physically seized Defendant at the top of the stairs but continued to issue commands at gunpoint directing him to the back of a squad car and finally to a jail cell the result would be the same.  Thus, law enforcement seized Defendant in the basement when he submitted to their show of authority. *See Flores-Lagonas*, 993 F.3d at 559-60.

Defendant also asserts that the requirement of an arrest by physical restraint is necessary to justify a protective sweep because law enforcement officers are vulnerable

15

conducting a physical arrest.[12]  (Doc. 33 at 2-3 (citing *Unites States v. Waldner*, 425 F.3d 514, 517 (8th Cir. 2005)).)  The defendant in *Waldner*, however, was not seized by a show of authority or even by force.  Law enforcement was present in his residence because a personal protection order required that he leave the premises.  425 F.3d at 515-16.  The search in *Waldner* was unlawful because an officer conducted a search of a room to which the defendant did not have access.  *Id.* at 517.  In short, *Waldner* does not stand for the proposition Defendant asserts.  Also, the facts here are distinct from those in *Waldner*.  Here, law enforcement lawfully entered Defendant's home and seized him.  The protective sweep of the Reed Street home was incident to an arrest.  Thus, I find that the protective sweep of the basement was in the space adjoining the arrest which occurred at the foot of the stairs in the basement.

Even if the arrest occurred at the top of the stairs to the basement[13] I would still find that the basement and the areas in it adjoined the staircase and landing where law enforcement physically restrained Defendant.  Defendant asserts, however, that the place of the arrest was the main level and that the spaces searched in the basement were not adjoining it.  (Doc. 33 at 3.)  Given the open nature of the basement and the slatted staircase, I disagree.  The two basement rooms law enforcement swept were in view of the open slatted staircase.  (Gov. Exs. 11A, 12, 29A-B, 30-31.)  The space in which he was arrested was connected to the areas searched.  *See United States v. Coleman*, 909 F.3d 925, 931 (8th Cir. 2018) (holding a search of a room connected to the place where

_____

[12] Defendant's argument that law enforcement requires more protection when physically seizing a person than when a person is seized by a show of authority is not particularly persuasive. (Doc. 33 at 3.)  A person who is not physically restrained may require closer observation and more law enforcement attention than a person in shackles.  Regardless, both situations present the opportunity for danger to law enforcement.

[13] In point of fact, law enforcement made their first physical contact with Defendant when he was kneeling on the top few steps.  When he was handcuffed, Defendant's feet and lower legs were hanging across the threshold above steps in the area that is clearly the stairwell to the basement.  (Gov. Ex. 6 Bloker BWC 10:22:22 – 10:22:47.)

a defendant was arrested was valid). I also note that each of those spaces was large enough to accommodate a person. (Galbraith Hr'g Test. at 26.) Thus, I find that the arrest was made in the basement and that the spaces searched were immediately adjoining the arrest.

### 2. Whether There Were "Articulable Facts" to Justify a Protective Sweep

Defendant argues that the Government is unable to show articulable facts justifying a protective sweep of the basement. (Doc. 23-1 at 4.) Defendant asserts that law enforcement knew no one else was in the residence given the short amount of time that passed between when J.J. fled and law enforcement arrived. (Doc. 33 at 3.) Defendant also asserts that Defendant's history suggesting that he may be dangerous is irrelevant to determining whether another dangerous person was present. (*Id.*) The Government argues that during the time between when J.J. left Reed Street and the first officer arrived, other individuals could have arrived at the home. (Doc. 27 at 13-14.) The Government asserts the protective sweep was necessary to make sure no one else was in the basement. (*Id.* at 14.)

At the hearing, Officer Galbraith explained that the protective sweep was meant to ensure there were no hazards to law enforcement and that no other victims were in the residence. (Galbraith Hr'g Test. at 14.) He also testified that he was concerned Defendant may have been manufacturing methamphetamine again which could pose a danger to anyone in the house. (*Id.* at 14-15.) He also identified the gap in time between when J.J. left and law enforcement arrived as a concern because law enforcement is unable to know if another person entered. Officer Galbraith also noted it was concerning that there was a possible firearm that had not been accounted for. (*Id.* at 18-19.)

Given the time that passed between when J.J. left the house and law enforcement arrived, it was not unreasonable for officers to be concerned that they did not know who was in the house and to sweep it for persons who might be present. *See United States v.*

*Alatorre*, 863 F.3d 810, 814 (8th Cir. 2017). The basement was an obvious place for someone to hide and also a place from which they could attack. *See id.* at 814-15. "Guns or other dangerous weapons were conceivably present in the residence given" both Defendant's criminal history and the warning that he may have gun. *Id.* at 815. Law enforcement left to secure the residence while a search warrant was obtained would be vulnerable to attack from someone in the residence. *Id.* Thus, I find that there were several articulable facts supporting the reasonable belief that an individual could be present that posed a danger to law enforcement during or after Defendant's arrest. *See id.* at 814.

**C.    *Whether J.J. Consented to the Search***

The Government also argues that even if the protected sweep was not justified, then the search was valid because another resident, J.J., consented to law enforcement entering the basement. (Doc. 27 at 16.) The Government asserts that the inevitable discovery exception to the exclusionary rule applies. (*Id.* at 16.) Defendant argues that consent was never given to search the residence and that the evidence is fruit of the poisonous tree. (Doc. 33 at 4.)

"To succeed under the inevitable-discovery exception to the exclusionary rule, the government must prove by a preponderance of the evidence: (1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of law enforcement misconduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation." *United States v. Conners*, 127 F.3d 663, 667 (8th Cir. 1997); *see also Nix v. Williams*, 467 U.S. 431, 433 (1984).

The Government is correct. Although J.J. did not initially grant law enforcement permission to search her residence, she ultimately requested that they help her find her phone because Defendant had taken it from her. Officers Weldon and Galbraith

recovered the phone in the basement where they also encountered the evidence found during the protective sweep.  Here, it is clear that law enforcement would have discovered by this lawful search for the phone the same evidence discovered in the earlier protective sweep.  *See United States v. Conners*, 127 F.3d at 667.  It is also clear that law enforcement would have been actively pursuing an alternative line of investigation—the recovery of J.J.'s stolen phone.  *See id.*  As such, the evidence found during the search for the phone would have led to the discovery of the firearms and would have provided a basis for a search warrant that was not tainted by "fruit of the poisonous tree."[14]  Thus, I find that J.J.'s consent to search for her phone permitted law enforcement to search the basement and that it was inevitable that the evidence found during the protective sweep would have been found at that time.

### D.     Whether Evidence Seized Pursuant to the First Warrant is "Fruit of the Poisonous Tree"

Defendant's principal contention is that the items seized after law enforcement obtained warrants and the statements he made in custody should be suppressed as fruit of the poisonous tree.  (Docs. 23-1 at 5-6; 34 at 2.)  For the reasons set forth above, I conclude the protective sweep and search for J.J.'s telephone were not illegal and, therefore, there is no poisonous tree to bear contaminated fruit.  However, should the Court disagree with me, I will analyze whether any such fruit must be excluded.

### 1.     Whether the First Warrant Contains Probable Cause After Allegedly Tainted Statements are Excised

The Government argues that even if the protective sweep was unconstitutional, the WPD search warrant would nevertheless be valid.  (Doc. 27 at 19.)  The Government asserts that the discovery of the money and syringe loaded with suspected

---

[14] I also find it persuasive that the protective sweep was appropriately limited because the police did not find the phone during it.  The evidence they did find was in plain view.

19

methamphetamine on Defendant's person would support a search warrant. (*Id.*) Defendant argues that the syringe and money would not support probable cause because both are legal to possess. (Doc. 33 at 4.) Defendant also asserts the *Leon* good faith exception does not apply here. (Doc. 33 at 5.)

"The exclusionary rule 'reaches not only primary evidence obtained as a direct result of an illegal search or seizure . . . but also evidence later discovered and found to be derivative of an illegality or fruit of the poisonous tree.'" *United States v. Swope*, 542 F.3d 609, 613 (8th Cir. 2008) (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)). "The sufficiency of a warrant affidavit which contains information from an unlawful search is evaluated after deleting that information." *United States v. Davis*, 760 F.3d 901, 903 (8th Cir. 2014) (citing *United States v. Hernandez Leon*, 379 F.3d 1024, 1027 (8th Cir. 2004)). Specifically, "when faced with a warrant containing information obtained pursuant to an illegal search, a reviewing court must excise the offending information and evaluate whether what remains is sufficient to establish probable cause." *United States v. Dessesaure*, 429 F.3d 359, 367 (1st Cir. 2005).

The Government maintains that, even if the information from the protective sweep or search for J.J.'s phone was excluded, probable cause would exist for the first warrant. (Doc. 27 at 19-24.) Evidence acquired through a source independent of the taint of a constitutional violation is admissible. *Wong Sun v. United States*, 371 U.S. 471, 487 (1963).

> A warrant obtained after an illegal search is not an independent source if either of the following are true: "if the agents' decision to seek the warrant was prompted by what they had seen during the [unconstitutional] entry," and "if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant."

*United States v. Swope*, 542 F.3d 609, 613 (8th Cir. 2008) (quoting *Murray v. United States*, 487 U.S. 533, 542 (1988)). In other words, two questions "must be answered in

the affirmative for the warrant to be an independent source: first, would the police have applied for the warrant had they not acquired the tainted information; and second, do the application affidavits support probable cause after the tainted information has been redacted from them." *Id.* at 613-14. If removing the tainted information from the warrant removes the basis for probable cause, anything seized in the search based on the warrant must be suppressed. *Murray*, 487 U.S. at 542. However, if the warrant with the information redacted still contains probable cause, any search based on the warrant was valid, barring other constitutional violations or deficiencies. *Swope*, 542 F.3d at 616-17 (finding application supported probable cause when reading the untainted portions of the warrant at issue).

The WPD search warrant would still support probable cause if the firearms and paraphernalia observed in the basement were excised and the warrant was based only on the evidence found incident to Defendant's arrest. (Gov. Ex. 27.) Officer Galbraith testified that he would have applied for a search warrant even if he did not conduct a protective sweep because of the knife, money, and syringe loaded with suspected methamphetamine found on Defendant's person. (Galbraith Hr'g Test. at 28-29.) Thus, I find the police would have applied for the warrant without the information from the protective sweep and the search for J.J.'s phone. *See Swope*, 542 F.3d at 613-614. Although the items Defendant possessed may be generally legal to possess under ordinary circumstances, there were facts, including his warrant for a drug court violation, that supported probable cause for a warrant to search the Reed Street house. While talking to the 911 operator, Ms. Lyons warned law enforcement that Defendant was likely high. (Gov. Ex. 1B.) This statement tends to support the belief that the syringe contained methamphetamine. Officer Galbraith also testified that he recognized that the liquid in the syringe was consistent with methamphetamine. (Galbraith H'rg Test. at 84.) Thus, I recommend that the Court find that the first or WPD warrant, even without the

information from the protective sweep and the search for J.J.'s phone, still contains probable cause to believe the residence may contain evidence associated with methamphetamine, which was a subject of the warrant. *See Swope*, 542 F.3d at 616-17.

### 2. *Good Faith Exception*

The Government also argues that because the first warrant contains probable cause absent any information from the protective sweep a warrant would issue and that the *Leon* good faith exception would apply. (Doc. 27 at 19, 22-23.) Defendant argues that law enforcement engaged in activity that was clearly illegal and that the exception cannot be applied. (Doc. 33, at 5.)

Under the good faith exception articulated in *United States v. Leon*, even if a reviewing court determines substantial evidence to issue a warrant is absent, the court should not suppress evidence seized pursuant to the search warrant if the officers executing the search warrant acted in objectively reasonable reliance on the issuance of the warrant by a neutral magistrate or judge. 468 U.S. 897, 922 (1984); *United States v. Houston*, 665 F.3d 991, 994-95 (8th Cir. 2012). "In making this determination, we ask 'whether a reasonably well-trained officer would have known that the search was illegal despite a judge's issuance of the warrant.'" *United States v. Lopez-Zuniga*, 909 F.3d 906, 909 (8th Cir. 2018) (quoting *United States v. Jackson*, 784 F.3d 1227, 1231 (8th Cir. 2015)).

Under the "good-faith exception," if a law enforcement officer's reliance on a warrant was objectively reasonable, the evidence seized pursuant to an invalid warrant will not be suppressed. *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007). *Proell* noted that *Leon* identified four scenarios where it is not objectively reasonable for the executing officer to rely on a warrant issued by a magistrate:

> (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge

"wholly abandoned his judicial role" in issuing the warrant; (3) when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) when the warrant is "so facially deficient" that no police officer could reasonably presume the warrant to be valid.

*Id.* at 431 (citing *Leon*, 468 U.S. at 923; *United States v. Puckett*, 466 F.3d 626, 630 (8th Cir. 2006)).

*Leon* explained that "[s]earches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a judge normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." 468 U.S. at 922 (quotations omitted). Nevertheless, "in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued." *Id.* at 922-23 (footnote omitted). "For the *Leon* exception to apply when the warrant is based on evidence obtained through a Fourth Amendment violation, [law enforcement's] prewarrant conduct must have been 'close enough to the line of validity to make the officers' belief in the validity of the warrant objectively reasonable.'" *United States v. Cannon*, 703 F.3d 407, 413 (8th Cir. 2013) (quoting *United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997)). If the prewarrant conduct is clearly illegal, however, the exception does not apply. *Cannon*, 127 F.3d at 413.

None of the four scenarios imagined by *Leon* apply here. Defendant instead argues that law enforcement's actions were clearly illegal because law enforcement exceeded the scope of the protective sweep. (Doc. 33 at 5.) As discussed above, I find that law enforcement did not exceed the scope of the protective sweep. Nothing on this record shows that any of law enforcement's conduct related to the first search warrant was "clearly illegal." Instead, the record shows that law enforcement's actions making the protective sweep and the search for J.J.'s phone never strayed from, or far from, the line of validity. *See Cannon*, 127 F.3d at 413. Thus, I find that law enforcement's conduct

23

was close enough to the line of validity to justify law enforcement's belief that the first search warrant was objectively reasonable. *See id.*

**E.  The Second Search Warrant**

    **1.  Compliance with Standing Order**

It is not clear to me why the second warrant—the warrant sought by the BHCSD regarding stolen property—is at issue. First, my standing order issued October 22, 2020, requires a defendant to submit an inventory describing the items he wishes to suppress in detail. Defendant submitted an inventory that seeks to suppress firearms, ammunition, and recorded statements. The firearms and ammunition were seized as a result of the first warrant. None of the items seized as a result of second warrant—mostly alleged stolen property—appears on the inventory. None of the items seized pursuant to the second warrant relate to the firearms seized under the first warrant. (Herbst Hr'g Test. at 113; Gov. Ex. 28.) Regardless of the legality of the second search warrant, none of the property seized by virtue of that warrant is at issue here. The "return of service" inventories several pages of personal property and miscellaneous evidence seized by the BHCSD, but no firearms, drugs, or drug paraphernalia. (Gov. Ex. 28 at 38-56.) Thus, I recommend that the Court deny Defendant's motion to suppress because Defendant seeks to suppress evidence not included in his inventory and, therefore, in violation of my standing order.

Furthermore, neither party has explained how any of the items seized as a result of the second warrant relates to the prosecution of Defendant in this Court for Possession of Firearms by a Prohibited Person. Of course, the instant motion seeks to suppress evidence on constitutional grounds and not bar it from admission at trial because it is irrelevant. Nevertheless, suppression motions should not be mere academic exercises questioning the validity of searches where the evidence in question is immaterial.

Because the Court may choose to reach the substance of Defendant's motion, I will address the parties' arguments.

### 2.  *Fruit of the Poisonous Tree*

To the extent the second search warrant is founded on information gleaned from the protective sweep, I recommend the Court conclude, as with the first warrant, those searches were constitutional and did not bear poison fruit.  However, because the Court may disagree with that conclusion, I will address whether the warrant is valid if information from those searches is excised from the warrant application.  Also, because Defendant alleges the existence of yet another poison tree in the garden, I will address whether BHCSD Captain Herbst's search of the basement invalidates the warrant.

### 3.  *The Parties' Arguments*

The Government argues that the tools and toolboxes observed during the protective sweep support probable cause for the second warrant.  (Doc. 27 at 20, 24.)  The Government also asserts the independent source doctrine validates search and seizure of the items recovered under the second warrant.  (*Id.*)  Defendant argues that the second search warrant was obtained illegally, and any evidence found based on it should be suppressed as fruit of the poisonous tree.  (Doc. 33. at 6.)

### 4.  *The Source of Information in the Second Affidavit*

The second warrant sought to seize items law enforcement believed Defendant had stolen during various burglaries.  (Gov. Ex. 28 at 5-8.)  The first question to be addressed is whether this warrant was based upon information from the protective sweep or, rather, upon Captain Herbst's search of the basement.  The affidavit of Deputy Haas contains only the following sentences regarding what "officers" saw in the basement of the Reed Street residence "while clearing the house:"

> While clearing the house, officers located two firearms and drug paraphernalia.  Officers also observed a number of different power tools,

tool boxes, and a registration for a 1998 Lund Boat to Patrick Kluesner at 2315 W. Bremer Avenue, Wavery, Iowa.

(Doc. 23-3 at 7-8.)  The affidavit does not state which officers saw these items.

The Government argues that Deputy Snyder observed the tools and toolboxes during his protective sweep.[15]  (Doc. 27 at 24.)  Deputy Snyder testified he was aware of the ongoing burglary investigation involving Defendant and took note of the tools he observed.

Captain Herbst testified that Deputy Snyder told him there were tools and toolboxes in the house and that Deputy Snyder also noticed a boat registration on the floor of the basement.  (Herbst Hr'g Test at 101.)  Captain Herbst also testified that by the time the second warrant was executed the firearms were gone because the WPD had executed the first search warrant.  (*Id.*)

I conclude that Deputy Snyder observed the potentially stolen property in the basement during the protective sweep.  Defendant does not point to anything that casts doubt on that conclusion.  Deputy Snyder's observations, even if not specifically attributed to him, could lawfully be included in Investigator Haas's affidavit. I note that Captain Herbst's separate observations are not noted in the affidavit in any manner. Investigator Haas's affidavit does not attempt to bolster the affidavit by, for example, stating that Captain Herbst returned to the scene and confirmed the presence of potentially stolen property.  Thus, even if Captain Herbst's observations are determined to be unconstitutional, I recommend the Court conclude those observations were not included in the affidavit and the evidence resulting from the second warrant need not be suppressed.

---

[15] In the time between October 25, 2020 and the hearing Deputy Snyder's body camera footage of his search of the basement was lost.  (Herbst Hr'g Test. at 101.)

**5.      Whether the Affidavit Contains Probable Cause if the Statements are Excised**

I also consider whether the independent source doctrine supports the warrant without the tainted information.  If the Court concludes that the evidence observed in the basement (either by the officers conducting the protective sweep or by Captain Herbst) should be excised from the second warrant I would find that the second warrant does not support probable cause.  *See Swope*, 542 F.3d at 613-614.

Absent the basement observations, the second warrant does not contain probable cause to believe that evidence is present there or elsewhere in the house.  J.J.'s statement as related in the second warrant does not address the evidence law enforcement observed in the basement.  (Gov. Ex. 28 at 8.)  She also disclaimed any knowledge of what was in the basement stating that she only went there to do laundry and did not know what Defendant did or had down there.  (Gov. Ex. 5 Weber Body Cam. at 10:38:25-10:39:01.)  In short, without the observations made during the protective sweep or information about what the basement contained from J.J., the BHCSD did not have reason to believe the basement contained any evidence related to its burglary investigation.

Also, there is no evidence that the WPD was interested in pursuing any stolen property investigation.  It is unclear that any of the WPD officers who swept the house or searched for J.J.'s phone would have recognized these items as possibly stolen property or would have been able to describe them in sufficient detail to describe them in a warrant application.  Thus, I reject the Government's argument that the search for J.J.'s phone or the observation of the WPD officers during the protective sweep constitute an exception under the independent source doctrine for the second warrant.  Here the doctrine does not validate the items recovered under the second warrant because removing the tainted information would also remove the basis for probable cause.  *See Murray*, 487 U.S. at 542.

**6.** **_Whether Captain Herbst's Observations Constitute an Unconstitutional Search_**

The Government describes Captain Herbst as having made a "brief observation" of the basement and claims his actions were not "clearly illegal." (Doc. 27 at 20, 24.) Notwithstanding this innocuous description, unless Captain Herbst's inspection of the basement falls into a recognized exception to the warrant requirement, it was not justified. The Government claims Captain Herbst's observations were akin to a "second look" at property after any reasonable expectation of privacy has been dispelled by a valid constitutional search. (Doc. 27 at 25 (citing _United States v. Lacey_, 530 F.2d 821, 824-825 (8th Cir. 1976)).) The Government overstates the holding of _Lacey_. In _Lacey_, Drug Enforcement Agents seized currency for safekeeping when the apartment they lawfully searched could not be secured. _Id._ at 822. The serial numbers on the currency were recorded on an inventory slip. _Id._ When the agents subsequently examined the inventory slip, they discovered serial numbers of currency used as "buy money." _Id._ _Lacey_ held,

> [T]he access of the DEA agents to the currency was lawful. We cannot say that the subsequent listing of the serial numbers of the currency as part of the inventory procedure invaded any reasonable expectations of privacy. We therefore hold that no unreasonable search or seizure occurred when the DEA agents simply transcribed into a permanent form serial numbers of currency which they had already lawfully observed.

_Id._ at 825. I cannot read _Lacey_ and subsequent cases that cite it to stand for the startling proposition that, having completed a valid protective sweep during which incriminating evidence was encountered, law enforcement may lawfully go back for a "second look" without a warrant or an exception to the warrant requirement. Thus, I conclude that Captain Herbst's observations in the basement do not qualify as a permissible "second look" at the property.

The Government also argues that J.J. gave law enforcement "broad consent for the police to be in her residence and take what they wanted." (Doc. 27 at 24.) How far

beyond the initial entry and the search for the phone J.J.'s consent can be discerned from the circumstances. Law enforcement remained in the Reed Street residence after Defendant was removed. Once Defendant was out of the residence, J.J. reentered and spoke with Officer Weber, who explained that there were guns in the basement that would be photographed and likely removed by law enforcement. (Gov. Ex. 5 at 10:27.) In response to this clear statement about guns from Officer Weber, J.J. seems to say, although it is less distinct, that the officers could take whatever they want. (*Id.*) The search for J.J.'s phone then ensued with law enforcement assistance. (*Id.* at 10:28.) After the phone was recovered, someone who appears to be a BHCSD deputy told J.J. they wanted to talk to her. (*Id.* at 10:38.) J.J. denied that she generally went to the basement. (*Id.*) She then left with a deputy, apparently for an interview with the BHCSD. (*Id.* at 10:40.) J.J. asserted no objection about anyone from law enforcement remaining in her residence. She knew law enforcement was staying and that others would be coming to photograph the firearms which were then in the basement. Throughout this time, law enforcement officers can be observed on BWC video entering and leaving the residence at will and without any objection from J.J. J.J. then left her child in the care of Mr. Lyons and law enforcement was still at the scene and in the residence. There is no evidence that J.J. told anyone from law enforcement that they were welcome to search anywhere they chose. However, there is also no evidence she objected to law enforcement presence where she observed it in the home.

The first video from Officer Weber's BWC concludes at about 10:42 a.m., i.e., after J.J. had left the residence. (*Id.*) A later video from Officer's Weber's BWC video commences at 11:15 a.m. and concludes at 11:20 a.m. (Gov. Ex. 8.) In this later video, Captain Herbst (who I recognize from his appearance in court) is present in plain clothes, including a red sweater. Captain Herbst is shown leaving at 11:17 a.m. but his observation of the basement is not shown on Officer Weber's video.

Captain Herbst testified he made his inspection of the basement because he was told enough "to pique [his] curiosity." (Herbst Hr'g Test. at 109.) Deputy Snyder's observations prompted Captain Herbst to go to the scene and search himself.[16] (*Id*.) He made that search knowing WPD had not yet obtained a search warrant. (*Id*.)

This Court has recently summarized how consent is determined:

A person may validly consent to the search of a home so long as such consent is "freely and voluntarily given, and not the product of implicit or explicit coercion." *United States v. Rambo*, 789 F.2d 1289, 1296 (8th Cir. 1986). Voluntariness requires "an essentially free and unconstrained choice" by the person giving consent. *Schneckloth v. Bustamante*, 412 U.S. 218, 225-26, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). In assessing the voluntariness of consent, courts should look to the totality of the circumstances. *Id*. This includes consideration of the environment and nature of the consent. *United States v. Zamoran-Coronel*, 231 F.3d 466, 468-69 (8th Cir. 2000). Courts should also examine the characteristics of the person giving consent, including:

> (1) [the person's] age; (2) his general intelligence and education; (3) whether he was intoxicated at the time; (4) whether he was informed of his Miranda rights before consenting; (5) whether any previous arrests would have informed him of his rights and protections; (6) the length of time he was detained; (7) whether the officers acted in a threatening manner; (8) whether the police made any promises or misrepresentations; (9) whether the police had [the person] in custody or under arrest at the time; (10) whether he consented in public; and (11) whether [the person] was silent during the search.

*United States v. Johnson*, 619 F.3d 910, 918 (8th Cir. 2010). "Voluntary consent may be express or implied." *United States v. Lakoskey*, 462 F.3d 965, 973 (8th Cir. 2006). Implied consent may be inferred from a person's "words, gestures, or other conduct." *United States v. Pena-Ponce*, 588

---

[16] "Q. Okay. And then as a result of talking to Snyder, is that why you went to the scene yourself? A. Yes." (Herbst Hr'g Test. at 109.)

F.3d 579, 584 (8th Cir. 2009). The ultimate question is whether "a reasonable officer would believe consent was given." *Id.*

Inference of implied consent to enter a home requires carefully consideration of the facts at hand. In *United States v. Rodriguez*, the Eighth Circuit Court of Appeals found implied consent was present. 834 F.3d 937, 941 (8th Cir. 2016). There, two officers in plain clothes knocked on the defendant's door and the defendant came out to his porch, closed the door behind him, and held open his screen-door. After the officers asked twice to go inside to talk, defendant wordlessly turned around, opened the door, went into the house, and held open the screen door. *Id.*, at 939-41. It was thus reasonable for the officers to infer that the defendant intended for them to follow him into the house. In *United States v. Serabia-Ferrel*, however, such consent was not present. No. 11-174 (DSD/FLN), 2011 WL 3625140, at *3 (D. Minn. Aug. 17, 2011). There, the defendant and a third-party opened their door to find seven officers on their doorstep, some of whom were in SWAT gear brandishing assault rifles. *Id.* After the officers asked twice to enter, the pair wordlessly stepped away from the door. *Id.*, at *1. The court there found that the totality of the circumstances showed that the officers could not have reasonably believed that the defendant consented to their entry. *Id.*, at *3.

*United States v. Hatcher*, 441 F. Supp. 3d 723, 736 (N.D. Iowa 2020).

Under these circumstances, I have no difficulty in concluding J.J. gave consent to law enforcement broad enough to permit Captain Herbst's "observation" of the basement. J.J. expressly consented to law enforcement entering into her home to confront Defendant. She also sought law enforcement's help in searching for her phone—including into the basement.[17] She was well aware of where officers were going in her home and was aware that other officers would arrive to take photographs of guns in the basement. Having left with a BHCSD deputy, J.J. was aware of the investigation by that department. She also appeared to be comfortable allowing law enforcement officers to remain in the

---

[17] Although Officer Weber testified she did not assist with the search for J.J.'s phone, in (Weber Hr'g Test at 69), her video shows she did look for the phone with J.J., including going into the basement. (Gov. Ex. 5 at 10:29.)

31

residence while she was absent. Nothing about the behavior of law enforcement could be deemed coercive of J.J. Nothing about J.J.'s response suggests she was not capable of giving knowing and voluntary consent. Thus, I recommend the Court find J.J.'s consent permitted Captain Herbst's unwarranted search of the basement

### 7. *Good Faith Exception*

The Government also argues that the *Leon* good faith exception would apply.[18] (Doc. 27 at 19, 22-23.) The Government asserts that because no action taken to secure the second warrant was "clearly illegal" and law enforcement's conduct "w[as] objectively reasonable" the good faith exception applies. (Doc. 27 at 23, 25.) Defendant argues that law enforcement engaged in activity that was clearly illegal and that the exception cannot be applied. (Doc. 33 at 5.)

Given J.J.'s consent, as described above, even if the Court finds Captain Herbst's search was unconstitutional, I find that Captain Herbst's search for evidence related to burglaries was near enough "the line of validity to make the officers' belief in the validity of the warrant objectively reasonable." *See Cannon*, 703 F.3d 4 at 413. With J.J.'s broad consent to enter her home, search it for her phone, and to remain present while she was absent, it was objectively reasonable for law enforcement to believe no Fourth Amendment violation occurred. *See United States v. Rodriguez*, 834 F.3d at 941. As such, I recommend that the Court find that the good faith exception would apply. *See Cannon*, 703 F.3d 4 at 413.

---

[18] Again, none of the physical evidence recovered under the second search warrant needs to be suppressed here because it is not included in the inventory. (Doc. 31; Gov. Ex. 28 at 38-56.) In fact, it is not at issue here. (Docs. 23; 31.) Defendant does not mention excluding evidence of the burglaries in any of his pleadings except by way of reference to the government's argument in his reply. The only evidence recovered under the second search warrant was of the burglaries. (Haas Hr'g Test. at 114.) Nevertheless, I continue to address the second warrant because the Government asserts it was valid and Defendant resists.

*F.* **Interviews**

Defendant requests that his statements made to law enforcement during two interviews be suppressed. (Docs. 29; 31.) He provides no argument to support that request, other than, perhaps, the general assertion that the statements are fruit of the poisonous tree. (Docs. 23; 23-1; 33.) The Government argues that Defendant's request is untimely and that the interviews are not fruit of the poisonous tree. (Doc. 34 at 1-2.)

On March 4, 2022, Defendant made his initial appearance in this Court. (Doc. 13.) On April 12, 2022, Defendant requested, and I granted, leave to file his motion to suppress and accompanying brief out of time. (Docs. 21; 22.) The Government did not resist that motion. (Doc. 21.) On May 2, 2022, Defendant filed an addendum to his motion which included his request to suppress the October 26, 2020 interview statements. (Doc. 29.) On May 5, 2022, Defendant filed an additional addendum to his motion which included his request to suppress the both the October 26, and November 2, 2020 interview statements. (Doc. 31.)

I find Defendant's addendums are untimely. Defendant did not seek leave or provide good reason for either. Thus, I recommend denying Defendant's request to suppress the statements as they were not included in his motion.

Nevertheless, should the Court decide to address the merits of Defendant's arguments, I consider whether any warrantless search taints these interviews. A statement is fruit of the poisonous tree when law enforcement acts illegally and then "obtained a statement by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *United States v. Yorgensen*, 845 F.3d 908, 912 (8th Cir. 2017). "The first question is whether there was a sufficient 'factual nexus between the constitutional violation' . . . 'and the challenged evidence.'" *Id.* at 914 (quoting *United States v. Riesselman*, 646 F.3d 1072, 1079 (8th Cir. 2011)).

Here, there is no nexus between the challenged evidence regarding Defendant's statements about firearms and the alleged constitutional violation, i.e., the protective sweep, Captain Herbst's search or any fruit of these alleged poisonous trees. Law enforcement conducted the interviews to inquire about the burglaries. The protective sweep and the search for J.J. phones revealed the firearms and Defendant brought up the firearms in the interview. Also, Defendant's custody was unrelated to the burglaries.

I also find that, even if there were a nexus, the attenuation doctrine would allow the statements. Evidence is admissible when the connection between the alleged constitutional violation and the evidence is "remote or has been interrupted by some intervening circumstance." *United States v. Yorgensen*, 845 F.3d 908 (8th Cir. 2017). (citing *Utah v. Strieff*, 579 U.S. 232, (2016)). To show that statements after an illegal search or seizure were voluntary to purge the taint, courts consider (1) whether Miranda warnings were given, (2) the "temporal proximity" between the constitutional violation and the statements, (3) intervening circumstances, and (4) the "'purpose and flagrancy of the official misconduct.'" *Riesselman*, 646 F.3d at 1080 (quoting *United States v. Lakoskey*, 462 F.3d 965, 975 (8th Cir. 2006)). *Riesselman* held that even if the district court had erred in finding no nexus between the Fourth Amendment violation and the defendant's later statements, it would have still affirmed because the government also showed that the statements were sufficiently attenuated from the constitutional violation that they were voluntary. *See id.*

By the time Defendant made his statements at the Black Hawk County Jail[19], several intervening circumstances had occurred that served to purge the taint of the constitutional violation. (Teisinger Hr'g Test. at 125.) First, the jail is removed from the Reed Street home where the initial constitutional violation may have occurred. *See*

---

[19] It is unclear where the interview occurred. The interviews appear to occur in a space controlled by the BHCSD and Defendant is dressed in jail clothing.

*Riesselman*, 646 F.3d at 1080 (citing *Vega-Rico*, 417 F.3d 976, 980 (8th Cir. 2005)). Second, Lieutenant Teisinger was not one of the officers involved in the events at Reed Street, and therefore was not involved in allegedly violating Defendant's Fourth Amendment rights. *See id.* I find that these factors weigh in favor of applying the attenuation doctrine.

Finally, because Defendant was re-*Mirandized*, I find that he knowingly waived his right to remain silent when he spoke during the interview. Defendant also had previous experience with the legal system. On the video, Defendant did not sound or appear to be under the influence or impaired such that he lacked the ability to waive his rights. (Gov. Exs. 36, 37.) Defendant appeared sufficiently clear-headed to give a knowing, intelligent, and voluntary waiver of his *Miranda* rights when he spoke with Lieutenant Teisinger. *See United States v. Contreras*, 372 F.3d 974, 977-78 (8th Cir. 2004) (waiver of *Miranda* rights valid when defendant appeared to be sober and in control of his faculties); *Goodwin*, 2000 WL 1852624, at *1. Defendant answered questions appropriately and asked appropriate questions. (Gov. Ex. 36, 37.)

I find a waiver here because of the factors just discussed. When a defendant has been advised of his *Miranda* rights, does not sign a waiver of rights or verbally waive his rights, but proceeds to voluntarily answer questions from law enforcement, he has engaged in a "course of conduct indicating waiver" of his right to remain silent. *Berghuis v. Thompkins*, 560 U.S 370, 386 (2010) (citation omitted); *see also United States v. Washington*, 109 F.3d 459, 465 (8th Cir. 1997) (holding that defendant waived his Sixth Amendment rights by electing to answer officer's questions after being *Mirandized*) (citing *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)); *United States v. Chartier*, No. CR13-0018, 2013 WL 5719483, at *11 (N.D. Iowa Aug. 16, 2013) (holding that defendant waived his right to remain silent by making "knowing, voluntary statements" to police officer after receiving *Miranda* warning), *R. & R. adopted as modified*, 2013

35

WL 5719482 (N.D. Iowa Oct. 21, 2013) (this issue not addressed in objections to R. & R.), *aff'd*, 772 F.3d 539 (8th Cir. 2014); *United States v. Wetsch*, Crim. No. 12-0045 SRN/J.J.G, 2013 WL 1435228, at *29 (D. Minn. Feb. 8, 2013) (holding that defendant waived his right to remain silent by voluntarily speaking to officers, and reasoning that "the Eighth Circuit has regularly held that a custodial defendant's continued responses to question[s] after being advised of his rights constitutes a waiver") (citing *United States v. Binion*, 570 F.3d 1034, 1041 (8th Cir. 2009)), *R. & R. adopted*, 2013 WL 1435210 (D. Minn. Apr. 9, 2013). As long as Defendant's statements were not coerced, his statements functioned as a waiver of his right to remain silent.

I find that Defendant voluntarily waived his right to remain silent and that his statements to Lieutenant Teisinger were not coerced. The totality of the circumstances show that Defendant understood his *Miranda* rights and voluntarily waived them. Defendant freely answered questions and by doing so engaged in a "course of conduct indicating waiver" of his right to remain silent. *Berghuis*, 560 U.S at 386. Importantly, when Defendant did not want to talk to anymore, he refused to say more. This indicates that he was speaking voluntarily up until that point.

Defendant's waiver was also "knowing and intelligent" and "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 424 (1986). Defendant is an adult and did not appear intoxicated in the interviews. Defendant responded promptly and appropriately to Lieutenant Teisinger's questions and asked appropriate questions of his own. He also refused to talk about subjects he did not wish to speak about. Having previously been arrested and having a current drug court violation at the time of this incident, Defendant had some experience with *Miranda* warnings, his right to remain silent, and the consequences of talking to law enforcement. Importantly, in these videos, Defendant appears to be of at least average intelligence and obviously understands the

English language. There is no argument or evidence that his mental abilities or English-language aptitude are impaired. Under these circumstances, this factor weighs in favor of finding the evidence sufficiently attenuated from the violation.

Nothing on this record weighs against finding attenuation. Defendant's interviews are not connected with any violation. In addition, several intervening circumstances occurred that would purge the taint of any violation: Defendant was not interviewed until October 26, and November 2, 2020, well after the events on the morning of October 25, 2020, at Reed Street, and then was questioned by an officer who was not present at Reed Street and who gave Defendant *Miranda* warnings. Also, Defendant requested the second interview.

In *United States v. Tolbert*, the court granted in part and denied in part a motion to suppress statements. The court granted the motion as to the defendant's un-*Mirandized* statements related to methamphetamine found in his coat pocket. No. CR06-4021-MWB, 2006 WL 3487457, at *4 (N.D. Iowa Dec. 4, 2006), *R. & R. adopted*, 2006 WL 3775900 (N.D. Iowa Dec. 21, 2006). The court denied the motion as to the defendant's later *Mirandized* statements related to the same methamphetamine and his role in a distributing the drug because "[i]n these circumstances, a careful and thorough administration of *Miranda* warnings serves to cure the condition that rendered the unwarned statement inadmissible." *Id.* at *5 (quoting *Oregon v. Estlad,* 470 U.S. 310, 310-11 (1985)). In effect, the same is true in the case at bar. Defendant gave a knowing, intelligent, and voluntary waiver of his *Miranda* rights at the jail. His statements about firearms after waiving his *Miranda* rights at the jail are admissible. Based on these facts, I recommend denying Defendant's Motion to Suppress as it pertains to statements made while in-custody.

## IV.     CONCLUSION

For the reasons set forth above, I respectfully recommend the District Court **deny** Defendant's Motion to Suppress.  **(Doc. 23.)**

Objections to this Report and Recommendation in accordance with 28 U.S.C. Section 636(b)(l) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation.  Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections.  *See* Fed. R. Crim. P. 59.  Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein.  *United States v. Wise,* 588 F.3d 531, 537 n.5 (8th Cir.  2009).

**DONE AND ENTERED** at Cedar Rapids, Iowa, this 10th day of June, 2022.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa