# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> DARREN JAMES ACKERMAN, <br><br> Defendant. | No. 21-CR-2023 CJW-MAR <br><br> **ORDER** |

## I. INTRODUCTION

This matter is before the Court on defendant's objections, (Doc. 38), to the Report and Recommendation ("R&R"), (Doc. 37), issued by the Honorable Mark A. Roberts, United States Magistrate Judge, recommending that the Court deny defendant's Motion to Suppress Evidence. (Doc. 23).

On April 13, 2022, defendant filed a Motion to Suppress. (Doc. 23). The government timely resisted the motion. (Doc. 27). On May 10, 2022, Judge Roberts held a hearing on the motion, (Doc. 32), and on June 10, 2022, he issued his R&R, recommending that the Court deny defendant's motion. (Doc. 37). On June 24, 2022, defendant timely filed objections. (Doc. 38).

For the following reasons, the Court **overrules** defendant's objections, **adopts** Judge Roberts' R&R, and **denies** defendant's Motion to Suppress.

## II. STANDARD OF REVIEW

The Court reviews Judge Roberts' R&R under the statutory standards found in Title 28, United States Code, Section 636(b)(1):

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in

1

whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

*See also* FED. R. CIV. P. 72(b) (stating identical requirements). While examining these statutory standards, the United States Supreme Court explained:

Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, *sua sponte* or at the request of a party, under a *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 154 (1985). Thus, a district court may review de novo any issue in a magistrate judge's report and recommendation at any time. *Id*. If a party files an objection to the magistrate judge's report and recommendation, the district court must review the objected portions de novo. 28 U.S.C. § 636(b)(1). In the absence of an objection, the district court is not required "to give any more consideration to the magistrate [judge]'s report than the court considers appropriate." *Thomas*, 474 U.S. at 150.

De novo review is non-deferential and generally allows a reviewing court to make an "independent review" of the entire matter. *Salve Regina Coll. v. Russell*, 499 U.S. 225, 238 (1991); *see also Doe v. Chao*, 540 U.S. 614, 620–19 (2004) (noting de novo review is "distinct from any form of deferential review"). The de novo review of a magistrate judge's report and recommendation, however, only means a district court "'give[s] fresh consideration to those issues to which specific objection has been made.'" *United States v. Raddatz*, 447 U.S. 667, 675 (1980) (quoting H.R. Rep. No. 94–1609, at 3, reprinted in 1976 U.S.C.C.A.N. 6162, 6163 (discussing how certain amendments affect Section 636(b))). Thus, although de novo review generally entails review of an entire matter, in the context of Section 636 a district courts required de novo review is

2

limited to "de novo determination[s]" of only "those portions" or "specified proposed findings" to which objections have been made. 28 U.S.C. § 636(b)(1).

Consequently, the Eighth Circuit Court of Appeals has indicated de novo review would only be required if objections were "specific enough to trigger de novo review." *Branch v. Martin*, 886 F.2d 1043, 1046 (8th Cir. 1989). Despite this "specificity" requirement to trigger de novo review, the Eighth Circuit Court of Appeals has "emphasized the necessity of . . . retention by the district court of substantial control over the ultimate disposition of matters referred to a magistrate [judge]." *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994). As a result, the Eighth Circuit Court of Appeals has concluded that general objections require "full *de novo* review" if the record is concise. *Id.* Even if the reviewing court must construe objections liberally to require de novo review, it is clear to this Court that there is a distinction between making an objection and making no objection at all. *See Coop. Fin. Ass'n, Inc. v. Garst*, 917 F. Supp. 1356, 1373 (N.D. Iowa 1996).

In the absence of any objection, the Eighth Circuit Court of Appeals has indicated a district court should review a magistrate judge's report and recommendation under a clearly erroneous standard of review. *See Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996); *see also Taylor v. Farrier*, 910 F.2d 518, 520 (8th Cir. 1990) (noting the advisory committee's note to Federal Rule of Civil Procedure 72(b) indicates "when no timely objection is filed the court need only satisfy itself that there is no clear error on the face of the record"); *Branch*, 886 F.2d at 1046 (contrasting de novo review with "clearly erroneous standard" of review, and recognizing de novo review was required because objections were filed).

The Court is unaware of any case that has described the clearly erroneous standard of review in the context of a district court's review of a magistrate judge's report and recommendation to which no objection has been filed. In other contexts, however, the

Supreme Court has stated the "foremost" principle under this standard of review "is that '[a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985) (citation omitted). Thus, the clearly erroneous standard of review is deferential, *see Dixon v. Crete Med. Clinic, P.C.*, 498 F.3d 837, 847 (8th Cir. 2007), but a district court may still reject the magistrate judge's report and recommendation when the district court "is left with a definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

Even though some "lesser review" than de novo is not "positively require[d]" by statute, *Thomas*, 474 U.S. at 150, Eighth Circuit precedent leads this Court to believe that a clearly erroneous standard of review should generally be used as the baseline standard to review all findings in a magistrate judge's report and recommendation that are not objected to or when the parties fail to file any timely objections. *See Grinder*, 73 F.3d at 795; *Taylor*, 910 F.2d at 520; *Branch*, 886 F.2d at 1046; *see also* FED. R. CIV. P. 72(b) advisory committee's note ("When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."). In the context of the review of a magistrate judge's report and recommendation, the Court believes one further caveat is necessary: A district court always remains free to render its own decision under de novo review, regardless of whether it feels a mistake has been committed. *See Thomas*, 474 U.S. at 153–54. Thus, although a clearly erroneous standard of review is deferential and the minimum standard appropriate in this context, it is not mandatory, and the district court may choose to apply a less deferential standard.

## III. FACTUAL BACKGROUND

Because neither party objected to Judge Roberts' factual findings based on the evidence presented during the suppression hearing, the Court reviews them for clear error. The Court finds no clear error in the recitation of facts contained in the R&R and adopts them without modification. These facts are as follows:

A. The 911 Call

On October 25, 2020, Beverly Lyons called 911 and reported that her son, Darren Ackerman ("Defendant"), tried to "choke out" his girlfriend J.J. Defendant was keeping J.J.'s phone from her and was possibly holding the couple's infant daughter hostage. (Gov. Ex. 1A.) Ms. Lyons reported to the 911 operator that J.J. ran from the couple's residence on Reed Street to Ms. Lyons's home on Columbia Street. (*Id.*; Gov. Ex. 2.) She also informed the operator that Defendant had outstanding warrants for drug court violations. (Gov. Ex. 1A.)

The operator called Ms. Lyons back and informed her that the WPD was sending Officer Rhonda Weber to meet J.J. and Ms. Lyons at Ms. Lyons's home. (Gov. Ex. 1B.) At this point, Ms. Lyons again warned the operator that when law enforcement arrived at the Reed Street address it may turn into a hostage situation because Defendant was likely high and knew he was facing prison. (Gov. Ex. 1B.) Neither Ms. Lyons nor J.J. knew if there were weapons in the Reed Street home. (Gov. Ex. 1C.) J.J. opined, however, that she did not think Defendant would hurt their daughter. (Gov. Ex. 1A.)

At 9:52 a.m., Officer Weber arrived at Ms. Lyons's home. (Gov. Ex. 4 at 3.) She spoke with Ms. Lyons, J.J., and Earl Lyons about the situation. J.J. told Officer Weber that Defendant threatened J.J., put his hands around her neck, punched her face, and would not return her phone. (Gov. Ex. 5 Weber Body Cam. at 10:03-10:05:00.). J.J. also informed Officer Weber she did not have a key with her to the Reed Street house. (*Id.*) J.J. accompanied Officer Weber to the Reed Street residence. During the car ride, J.J. advised Officer Weber that "You can just push the front door in." (*Id.* at 10:08:36.)

B. The Entry

Upon arriving at the Reed Street house, Officer Weber confirmed that J.J. lived at the house and asked her if the officers on the scene could force their way into the home. (*Id.* at 10:10:07-10:10:18.) J.J. replied,

5

"Do what you have to do." (*Id.*) Officer Weber relayed J.J.'s permission to the other officers.

Before forcing entry, however, WPD Officer Adam Galbraith knocked on the front door and called for Defendant to answer. At the front door with Officer Galbraith were Deputy Andrew Snyder, Sergeant Andrew Clark, and Officer Weber. (Galbraith Hr'g Test. at 8.) At the hearing, Officer Galbraith testified that Defendant knew him from previous interactions involving Defendant and the sale or distribution of narcotics. (Galbraith Hr'g Test. at 5-6.) Regardless, Defendant did not answer the door.

Meanwhile, WPD Officers Benjamin Bloker and Brian Weldon had positioned themselves at the back door of the house. After Defendant failed to respond for approximately nine minutes, Officer Galbraith attempted to kick the front door down. (Gov. Ex. 5 Weber Body Cam. at 10:19-10:22.) He was unsuccessful because the door was dead bolted. (Galbraith Hr'g Test. at 9.) At the same time, Officer Bloker attempted to break down the back door and ultimately succeeded at 10:21. (Gov. Ex. 6 Bloker Body Cam. at 10:21.)

### *C. The Arrest*

Officers entered the house through the back door with firearms or tasers drawn and began searching for Defendant. (Galbraith Hr'g Test. at 11.) As they searched the main level, law enforcement learned that Defendant was threatening to take his own life with a firearm. (Gov. Ex. 5 Galbraith Car at 10:15.) Finding no one on the main level, Officer Weber opened the door to the basement where she saw Defendant at the bottom of the stairs, holding his daughter with one hand, and a cellphone in the other. (Gov. Ex. 5 Weber Body Cam. at 10:21:52.) The officers ordered Defendant to come up the stairs with his daughter. (*Id.* at 10:21:57.) Officer Galbraith testified, and body camera footage shows, that the officers ordered Defendant to come up the stairs to remove him from an unknown location to one where law enforcement had control. (*Id.*) In this case, the basement had areas that were as yet unseen and thus were unknown to officers. (Galbraith Hr'g Test. at 12.)

Defendant dropped the cellphone, walked up the stairs, and passed his daughter to Officer Weber. The officers ordered him onto the ground and handcuffed him. While searching his person incident to the arrest, officers found $1,100 dollars in denominations they testified are consistent with drug sales, a syringe that law enforcement suspected contained methamphetamine, and a knife. (Galbraith Hr'g Test. at 13-14, 30.)

6

### D. The Protective Sweep

After making the arrest, Officer Galbraith and Deputy Snyder conducted a protective sweep of the basement. Officer Galbraith stated that one factor in his decision to conduct the protective sweep was his knowledge that Defendant manufactured methamphetamine fifteen years ago and, if he was making methamphetamine in the basement, it could pose a danger. (Galbraith Hr'g Test. at 15.) Deputy Snyder had also warned law enforcement entering the Reed Street home that Defendant might have a gun. (*Id.* at 16-17.) Officer Galbraith also considered the possibility that the gun was unaccounted for and unsecured in making the protective sweep. Another factor was that some time passed between J.J. leaving the Reed Street home and law enforcement arrival during which unknown individuals may have arrived at Reed Street. (*Id.* at 16.)

After entering the basement, Officer Galbraith saw the butt of a firearm sticking out of the open door to the "canning room." (*Id.* at 20.) Looking in that room, he saw two rifles lying out. (*Id.*; Gov. Exs. 14-18.) Specifically, a Diamond Arms 16-gauge shotgun and a Harrington and Richardson Fieldsman .22-calliber bolt-action rifle. (Galbraith Hr'g Test. at 22.)

Officer Galbraith then entered a second open room in the basement, located at the base of staircase, where he observed torches, a digital scale, a spent shotgun shell, and a drug pipe. (*Id.* at 23-25; Gov. Exs. 21; 22; 23)

### E. J.J.'s Cellphone

After Defendant was removed from the house and the protective sweep was completed, J.J. asked law enforcement for help locating her cellphone. (Gov. Ex. 5 Weber Body Cam. at 10:28:15; Galbraith Hr'g Test. at 27-28.) Officer Galbraith returned to the basement with Officer Weldon to search for the phone. (Gov. Ex. 8 Weldon Body Cam. at 10:34:52; Galbraith Hr'g Test. at 27.) Officer Weldon searched the room containing drug paraphernalia and found the phone. (Gov. Ex. 8 Weldon Body Cam. at 10:34:52-10:36:25.)

### F. The WPD Search Warrant

Officer Galbraith drafted the affidavit upon which the "WPD warrant" or "first warrant" was issued. (Gov. Ex. 27.) Officer Galbraith testified that he applied for a search warrant because of the knife, money, and loaded syringe found on Defendant's person. (Galbraith Hr'g Test. at 28-29.) He also applied for a search warrant because of the guns he observed during the protective sweep of the basement. (*Id.* at 29.) He

7

testified that he would have still sought a search warrant to look for evidence of drugs and drug sales based only on the evidence found on Defendant's person in the search incident to the arrest. (*Id.*) While executing the search warrant, law enforcement found additional firearms. (Gov. Exs. 32, 33, 34; Galbraith Hr'g Test. at 33-34.)

## G. The Black Hawk County Search Warrant

While Waterloo police waited for the WPD search warrant, the BHCSD sought its own search warrant to search for stolen property. (Gov. Ex. 28.) Captain Mark arrived at Reed Street while Waterloo police were obtaining a search warrant. (Herbst Hr'g Test. at 94.) Law enforcement was present in the house to secure it when Captain Herbst arrived. Captain Herbst testified that other officers told him that there were tools and toolboxes in Defendant's basement that may be related to the investigation of the Defendant Captain Herbst was working on. (*Id.* at 95.) He later clarified that he was told enough "to pique [his] curiosity." (*Id.* at 109.)

After his arrival, Captain Herbst went to the basement accompanied by Officer Weber. (*Id.* at 95.) In the basement, he observed a few toolboxes and registration for a boat. (*Id.* at 95, 109.) Captain Herbst testified that while in the basement he knew that the first search warrant was not ready to be executed and that a protective sweep was already completed. (*Id.* at 110.)

After his inspection of the basement with Officer Weber, Captain Herbst then helped Investigator Haas draft a second search warrant; specifically, he helped draft the addendum to that warrant. (*Id.* at 96.) Investigator Steve Haas was one of the investigators working on a burglary case in which Defendant was a suspect. (Haas Hr'g Test. at 116.) He testified that he wrote the search warrant and used information provided by officers at the Reed Street house to do so. (*Id.* at 120.) The second search warrant was issued and executed at 3:00 p.m. (*Id.* at 121.) Deputies recovered items associated with burglaries but no firearms during the execution of the second warrant. (*Id.* at 114.)

## H. The Interviews

On October 26, 2020, and November 2, 2020, Defendant made statements to investigators while in custody. (Gov. Exs. 36; 37.) BHCSD Lieutenant Lance Teisinger conducted both interviews. (Teisinger Hr'g Test. at 125.)

At the October 26, 2020 interview, Lieutenant Teisinger read Defendant his Miranda rights. (*Id.*) He testified that the purpose of the interview was to discuss Defendant's involvement in thefts and burglaries.

8

(*Id.*) Defendant, however, brought up firearms. (*Id.* at 126.) Lieutenant Teisinger then asked Defendant about firearms but Defendant then declined to talk about that. (*Id.*) Later in the interview Defendant mentioned he planned to use one of the firearms to take his own life. (*Id.*)

After more than a week in custody, the November 2, 2020 interview was conducted because Defendant sent a "kite," a note requesting to speak with Lieutenant Teisinger. (*Id.* at 126-27.) Lieutenant Teisinger again read Defendant his Miranda rights. (*Id.* at 127.) At no point during either interview did Defendant request a lawyer. (*Id.* at 129.)

(Doc. 37, at 6–12) (footnotes omitted).[1] The Court will add additional facts as needed in its analysis of the R&R.

## IV. ANALYSIS

From the evidence provided at the hearing, Judge Roberts recommended that defendant's motion to suppress be denied. (Doc. 37, at 6). Defendant objected to Judge Roberts' following conclusions: (a) the arrest was made in the basement and the spaces searched in the protective sweep were immediately adjoining the arrest, and there were articulable facts that justified the protective sweep; (b) J.J. consented to the search; (c) the evidence gathered from the first warrant should not be excluded as fruit of the poisonous tree; and (d) the good faith exception applies. (*Id.*, at 14–23). The Court will address each of defendant's objections in turn.

### A. *The Protective Sweep*

In the R&R, Judge Roberts made two findings regarding the protective sweep. First, Judge Roberts concluded that defendant was arrested at the bottom of the stairs because that is where defendant submitted to the authority of law enforcement officers. (Doc. 37, at 15). In particular, Judge Roberts concluded that defendant was "seized at

---

[1] The Court has reviewed the footnotes in the R&R and concluded that they are not clearly erroneous. The footnotes are secondary to the factual narrative and the Court found it unnecessary to reproduce them here.

the bottom of the stairs by a show of authority from the top of the stairs and then physically restrained at the top of the stairs." (*Id.*). Judge Roberts further concluded that even if the arrest did occur at the top of the stairs, he still would have concluded that the areas searched in the basement were adjoining the arrest location because they were in view of the open, slatted staircase and connected to it. (*Id.*, at 16–17). Second, Judge Roberts found that there were articulable facts that justified a protective sweep. Judge Roberts noted the gap in time between when J.J. left the house and when officers arrived. (*Id.*, at 17). Judge Roberts explained that the gap in time could have allowed other individuals to enter the house, where the basement offered a viable place to hide and launch an attack. (*Id.*, at 17–18). Judge Roberts also concluded that defendant's criminal history and the warning officers received about him possessing a firearm served as articulable facts. (*Id.*, at 18).

### *1. Whether the Protective Sweep was Conducted in the Space Immediately Adjoining the Arrest*

Defendant objects to Judge Roberts' conclusions regarding where the arrest occurred and whether the areas searched were immediately adjoining that location. (Doc. 38, at 1–2). Defendant argues that Judge Roberts erred in concluding that defendant was arrested at the bottom of the stairs and instead argues that the arrest occurred at the top entrance of the stairs because that was where defendant was restrained with physical force. (*Id.*). Defendant urges that an arrest that occurs upon submission to authority is only possible when physical force is absent, which defendant argues was not the case here because defendant was physically restrained at the top entrance of the stairs. (*Id.*, at 2). Relatedly, defendant argues that because the arrest took place at the top of the stairs, the areas searched in the protective sweep cannot be considered areas immediately adjoining the place of arrest. (*Id.*, at 2–3).

10

The Court agrees with Judge Roberts' conclusion that the arrest occurred at the bottom of the stairs. As made clear in the R&R, "[a] Fourth Amendment seizure occurs 'when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *United States v. Flores-Lagonas*, 993 F.3d 550, 559 (8th Cir. 2021) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). Notably, for a seizure to be complete, the individual must actually submit to the show of authority, it is not enough "for the police to only *attempt* to stop the individual[.]" *Flores-Lagonas*, 993 F.3d at 560 (emphasis in original). Here, defendant was "*actually* stop[ped]." *Id.* Defendant had the opportunity to retreat farther into the basement when officers drew their weapons and ordered him to the top of the stairs, however, defendant complied by walking up the stairs and handing his daughter to law enforcement. (Doc. 39, at 14). The later use of physical force when defendant was handcuffed does not nullify the seizure of defendant when he submitted to the officer's authority at the bottom of the stairs.

The Court also agrees that the areas searched in the protective sweep were immediately adjoining the arrest area. As Judge Roberts explained, "[a] 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *United States v. Alatorre*, 863 F.3d 810, 813 (8th Cir. 2017) (quoting *Maryland v. Buie*, 494 U.S. 325, 327 (1990)). The two rooms that were searched in the protective sweep were immediately adjoining the arrest location. One room was immediately across from the base of the stairs where the arrest occurred, (Doc. 27-3, at 1), and the other room, described as the "canning room," was also visible from the arrest location through the slatted stairs. (Doc. 27-8, at 1). Also, as Judge Roberts pointed out, both rooms were large enough to hold a person, (Doc. 37, at 17), and therefore could serve as a place "from which an attack could be immediately launched." *Buie*, 494 U.S. at 334.

The Court also agrees with Judge Roberts' finding that had the arrest occurred at the top of the stairs, a protective sweep in the basement would still have been warranted. In particular, because the staircase was open and slatted, (Doc. 27-8, at 1), it is reasonable to think that an attack could have been launched from the searched rooms that were also in close proximity to the staircase. (Doc. 27-8, at 4).

This objection is **overruled**.

### 2. Whether There Were "Articulable Facts" to Justify a Protective Sweep

Defendant argues that there were no articulable facts that would justify the protective sweep. (Doc. 38, at 3). In particular, defendant argues that law enforcement knew that J.J. had fled the residence a few minutes before they arrived. (*Id.*, at 3–4). Therefore, defendant urges, a reasonably prudent officer would not be concerned about a threat from any potential accomplices in the residence. (*Id.*).

The Court also agrees with Judge Roberts' finding that, although the protective sweep was conducted in spaces immediately adjoining the arrest, there were also articulable facts that justified the sweep. (Doc. 37, at 17–18). "The Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Buie*, 494 U.S. at 337. Here, such a belief would have been reasonable because approximately ten minutes passed between when J.J. fled the residence and when officers arrived, (Doc. 27-2, at 9) (Doc. 39, at 17), which suggests that another person could have entered the residence and posed a danger to the officers within. Also, the officers were aware of defendant's criminal history and reputation for resisting arrest. (Doc. 27-2, at 1); *see United States v. Whitehead*, 995 F.3d 624, 626 (8th Cir. 2021) (holding that defendant's criminal history was one articulable fact justifying a protective sweep).

12

Last, officers were also warned that defendant may have possessed a firearm, that, at the time of his arrest, was unaccounted for. (Doc. 27-2, at 9); *see United States v. Thompson*, 6 F.4th 789, 793 (8th Cir. 2021) (holding that suspicions regarding defendant's previous possession of firearms constituted one articulable fact justifying a protective sweep). The Court, therefore, agrees with Judge Roberts' conclusion that there were articulable facts justifying the protective sweep.

This objection is **overruled**.

### B. *Whether J.J. Consented to the Search*

Judge Roberts concluded that the inevitable-discovery exception to the exclusionary rule applied. (Doc. 37, at 18). Judge Roberts found that while officers were looking for J.J.'s phone after she requested their assistance, the officers would have discovered the same evidence that was discovered during the protective sweep. (*Id.*, at 18–19). In sum, Judge Roberts concluded that "J.J.'s consent to search for her phone permitted law enforcement to search the basement and that it was inevitable that the evidence found during the protective sweep would have been found at that time." (*Id.*, at 19).

Defendant objects and argues that although J.J. did request assistance to locate her phone, she did not request that anyone go into the basement. (Doc. 38, at 4–5).

The Court agrees with Judge Roberts' conclusion. As outlined by Judge Roberts:

> [t]o succeed under the inevitable-discovery exception to the exclusionary rule, the government must prove by a preponderance of the evidence: (1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of law enforcement misconduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation.

*United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997).[2] First, it was lawful for the officers to explore the basement after J.J. requested assistance in finding her telephone. Here, J.J., a resident of the home, explicitly requested the officers' assistance in locating her phone. (Doc. 39, at 29). In the Court's eyes, it was not necessary, as defendant seems to claim, that J.J. explicitly state each room that the officers were allowed to enter in the search for her phone. Also, the officers' search of the basement was a logical result of J.J.'s request because that was the last place defendant had been prior to his arrest and he had allegedly been in possession of her phone. Ultimately, the phone was recovered by Officer Waldon in a room near the bottom of the stairs in the basement. (Doc. 39, at 88–89). Second, because officers were attempting to locate and return J.J.'s stolen phone, officers were pursuing an alternative line of investigation. The Court agrees with Judge Roberts that the inevitable-discovery exception applies.

This objection is **overruled**.

### C. *Whether the Evidence is Fruit of the Poisonous Tree*

Although Judge Roberts concluded that there was no poisonous tree because the protective sweep and phone search were both legal, Judge Roberts still analyzed defendant's claim that the evidence seized was fruit of the poisonous tree. (Doc. 37, at 19). Judge Roberts concluded that there was probable cause for the search warrant even if the items observed in the protective sweep, namely the firearms and drug paraphernalia, were excised. (*Id.*, at 21). In particular, Judge Roberts found that because officers found a syringe, suspected of containing methamphetamine, and a large amount of cash on defendant during his arrest, the officers would have applied for a warrant anyway. (*Id.*). Also, Judge Roberts recognized that although neither of those items are generally illegal

---

[2] The Court recognizes that both prongs have been inconsistently required in the Eighth Circuit. *Compare United States v. Munoz*, 590 F.3d 916, 923 (8th Cir. 2010), *with United States v. Reinholz*, 245 F.3d 765, 769 (8th Cir. 2001). Because both prongs are satisfied here, the Court need not resolve this conflict.

to possess, because the officers were aware of defendant's drug court violation warrants, the potential that he was high, and that the substance in the syringe was consistent with methamphetamine, there was probable cause for a warrant. (*Id.*).

Defendant objects, claiming that because the evidence described in the addendum to the search warrant was the result of an illegal protective sweep, the search warrant was invalid and the evidence discovered as a result of it should be suppressed. (Doc. 38, at 5). Defendant argues that because the money and syringe are legal to possess, "[b]y themselves, they would not have been sufficient to obtain a search warrant for an entire residence." (*Id.*).

The Court agrees with Judge Roberts. As Judge Roberts recognized and defendant argues, the syringe and money are not illegal to possess. However, given what officers knew about defendant and the items recovered, the Court agrees with Judge Roberts' conclusion that officers would have applied for a search warrant regardless of the information from the protective sweep. The search warrant application, absent any information obtained as a result of the protective sweep, "sets forth sufficient facts to lead a prudent person to believe that there is a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Grant*, 490 F.3d 627, 631 (8th Cir. 2007) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). First, defendant had two warrants for drug court violations, had been previously convicted for the manufacture of methamphetamine and possession of precursor, and the liquid in the syringe was consistent with methamphetamine. (Doc. 27-7, at 5). Second, the money recovered from defendant during his arrest amounted to more than $1,000 and was "consistent with how one encounters bills in street level drug trafficking and sales." (Doc. 27-7, at 5; Doc. 39, at 31). Given the evidence obtained during the arrest search and defendant's history of involvement with methamphetamine, the officers would have had probable cause to believe the residence was tied to illegal methamphetamine activity.

15

Overall, the Court agrees with Judge Roberts that the officers would have successfully applied for a search warrant without the evidence from the protective sweep and had probable cause to do so.

This objection is **overruled**.

### D. *Whether the Good Faith Exception Applies*

Last, Judge Roberts concluded that because the officers' actions in the protective sweep and search for J.J.'s phone did not stray from "the line of validity[,]" (*United States v. Cannon*, 703 F.3d 407, 413 (8th Cir. 2013) (quoting *Conner*, 127 F.3d at 667)), the officers' were justified in their belief that the search warrant was objectively reasonable and therefore the evidence is protected by the good faith doctrine. (Doc. 37, at 23–24).

Defendant objects and argues that because the officers' pre-warrant conduct was "clearly illegal," the *Leon* good faith exception does not apply. (Doc. 38, at 6). Defendant argues that because officers exceeded the scope of the protective sweep and "continu[ed] to wander around the residence to search for evidence" that their actions were "clearly illegal." (*Id.*).

Here, the Court agrees with Judge Roberts. The *Leon* good faith exception protects evidence obtained as the result of officers' "objectively reasonable reliance on a subsequently invalidated search warrant[.]" *United States v. Leon*, 468 U.S. 897, 922 (1984). As Judge Roberts pointed out, there are four scenarios where an officer's reliance on a warrant would not be objectively reasonable, none of which are applicable here:

> (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge "wholly abandoned his judicial role" in issuing the warrant; (3) when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) when the warrant is "so facially

16

> deficient" that no police officer could reasonably presume the warrant
> to be valid.

*United States v. Proell*, 485 F.3d 427, 431 (8th Cir. 2007) (citing *Leon*, 468 U.S. at 923). Ultimately, Judge Roberts concluded that the officers' conduct was "close enough to the line of validity" and therefore was reasonable:

> [f]or the *Leon* exception to apply when the warrant is based on evidence obtained through a Fourth Amendment violation, the detectives' prewarrant conduct must have been 'close enough to the line of validity to make the officers' belief in the validity of the warrant objectively reasonable'.

*Cannon*, 703 F.3d at 413 (quoting *Conner,* 127 F.3d at 667). Defendant urges that the *Leon* good faith exception cannot apply because "[i]f the officers' prewarrant conduct is 'clearly illegal,' the good-faith exception does not apply." *Cannon*, 703 F.3d at 413 (quoting *Conner*, 127 F.3d at 667). Here, the officers' actions were not "clearly illegal." For the reasons previously mentioned, the protective sweep was constrained to the area immediately adjoining the arrest location at the bottom of the stairs, the evidence observed in the sweep would have been seen in the officers' lawful search for J.J.'s phone, and defendant's criminal history and the objects found on him during his arrest provided probable cause for a warrant absent anything observed during the protective sweep or search for the phone. The Court, therefore, agrees with Judge Roberts' conclusion that the officers' conduct was not "clearly illegal" and did not stray from "the line of validity[.]"

This objection is **overruled**.

## V. CONCLUSION

For the reasons stated above, defendant's objections, (Doc. 38), are **overruled**. The Court **adopts** Judge Roberts' R&R, (Doc. 37), and **denies** defendant's Motion to Suppress (Doc. 23).

**IT IS SO ORDERED** this 29th day of July, 2022.

_____
C.J. Williams
United States District Judge
Northern District of Iowa